Steven James Goodhue (#029288)
Law Offices of Steven James Goodhue
9375 East Shea Blvd., Suite 100
Scottsdale, AZ  85260
Telephone: (480) 214-9500
Facsimile: (480) 214-9501
E-Mail: sjg@sjgoodlaw.com

*Attorney for Plaintiff*
*AF Holdings, L.L.C.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AF HOLDINGS, L.L.C., a St. Kitts and Nevis limited liability company, | CASE NO.: 2:12-CV-02144-PHX-GMS |
| Plaintiff, | |
| v. | **PLAINTIFF AF HOLDINGS' RESPONSE TO ORDER TO SHOW CAUSE** |
| DAVID HARRIS, | |
| Defendant. | |

## INTRODUCTION

On May 17, 2013, the Court ordered Plaintiff to identify: (1) the persons who signed Exhibit B in the names of Raymond Rogers and Alan Cooper; (2) all persons who hold any interest in Plaintiff; and (3) if Exhibit B to the Complaint is in fact not signed by Alan Cooper and/or Raymond Rogers why Plaintiff and/or counsel should not be sanctioned pursuant to the Court's inherent power and Fed. R. Civ. P. 11 for filing a fraudulent document with this Court.  (*Id.*)  Plaintiff hereby respectfully responds to the Court's order to show cause.

///

**DISCUSSION**

## I.   THE PERSONS WHO SIGNED EXHIBIT B IN THE NAMES OF RAYMOND ROGERS AND ALAN COOPER ARE RAYMOND ROGERS AND ALAN COOPER

The persons who signed Exhibit B to Plaintiff's complaint are Raymond Rogers and Alan Cooper.[1]  Although Cooper has repudiated his corporate representative status, Cooper's repudiation lacks credibility for the reasons set forth herein.

### A.   Raymond Rogers Executed the Agreement on Behalf of the Assignors, and an Assignor's Signature is Effective to Give Plaintiff Standing

Raymond Rogers executed the assignment agreement on behalf of the assignors. (*See* ECF No. 1-2.)  Rogers also signed an affidavit confirming his execution.  *See* Rogers Aff. ¶¶ 1-6 (attached hereto as Exhibit A).  Rogers' affidavit goes to the heart of what Plaintiff understands the Court's core inquiry to be: whether Plaintiff has standing to pursue claims for copyright infringement against the Defendant.

The assignment in this case is valid irrespective of the potential issues raised by Alan Cooper's repudiation.  As the Ninth Circuit has explained, "The rule is really quite simple: If a copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so.  It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990); *see also* 17 U.S.C. § 204 (establishing two requirements for a valid copyright assignment: (1) a writing; (2) signed by the assignor); *Sunham Home Fashions v.*

---

[1] Plaintiff conferred with Raymond Rogers and obtained an affidavit from him attesting that he personally signed the assignment.  Plaintiff has been unable to confer with Mr. Cooper on this matter.  Mr. Cooper has disclaimed personally acknowledging the assignment, but to Plaintiff's knowledge has not disclaimed authorizing a third-party to do so on his behalf.

2

*Pem-America, Inc.*, 2002 U.S. Dist. LEXIS 24185 at 22 (S.D.N.Y.  Dec. 17, 2002).  There is no dispute whether the assignment was written or signed by the assignor.  It was written; it was signed by the assignor.  Any signature on the assignment other than the assignor's, Raymond Rogers, has absolutely no bearing on the assignment's validity, whether Plaintiff brought this case in good faith, or whether Plaintiff will ultimately prevail against Harris.

### B.    Alan Cooper's Repudiation is Not Credible

Alan Cooper's repudiation of his corporate representative status is not credible.  To put Cooper's repudiation in its proper context, the Court might consider the following questions: (1) why is an individual from Northern Minnesota testifying before courts across the United States in copyright infringement actions; (2) how is he paying for all of this; and (3) when did he get his start?  Cooper's testimony at a March 11, 2013, hearing before Judge Wright provided some clues.[2]

At the hearing, Cooper revealed that he first became involved in this nationwide effort when he received an anonymous text message with contact information for EFF panel attorney, Paul Godfread.  *See* Transcript, March 11, 2013 Hearing on Order to Show Cause, at 26:1-4 (attached hereto as Exhibit B).  The text message informed Cooper that he needed to contact Godfread to avoid serious liability.  *Id.*  Shortly thereafter, Cooper, through attorney Godfread, filed a lawsuit against attorney John Steele and others seeking $4.6 million in damages for the misuse of his name.  *Cooper v. Steele et* al., 27-CV-13-3463 (Minn. Dist. Ct., Hennepin Cty., 2013).  Contemporaneously with those efforts, EFF[3] panel

---

[2] Plaintiff was not allowed to cross-examine Cooper.

[3] The overriding mission of the Electronic Frontier Foundation has been to shield the Internet from effective regulation—"defending it from the intrusion of territorial government." Jack L. Goldsmith & Tim Wu, Who Controls the Internet?: Illusions of a Borderless World 18 (2006). This mission relies on undermining effective enforcement of intellectual property

attorneys from across the nation began using Cooper's repudiation to launch collateral attacks on Plaintiff's copyright infringement lawsuits.  *See, e.g.,* Affidavit of Alan Cooper, *AF Holdings, LLC v. David Trinh*, No. 3:12-cv-2393 (N.D. Cal. Dec. 13, 2012) ECF No. 30-3.  These attacks met with limited success, with one notable exception—the sanctions order issued by Judge Wright.  EFF panel attorneys paid for Cooper and Godfread to fly from Minnesota to the Los Angeles, California hearing before Judge Wright and Cooper was escorted around at the hearing by an EFF staff attorney who has spearheaded the EFF's efforts to stymie copyright enforcement nationwide.  *See* Declaration of Morgan Pietz re: Fees and Costs, *Ingenuity13, LLC v. John Doe*, No. 2:12-cv-8333-ODW-JC (C.D. Cal. April 4, 2013) ECF No. 102.

Cooper's testimony—along with the background information below—suggest to Plaintiff that Cooper was manipulated by attorney Godfread into repudiating his corporate representative status.  Godfread, in likely coordination with other attorneys, appears to have offered Cooper "protection" from illusory liability and a potential windfall judgment against attorney Steele in consideration for the repudiation.  Further, on information and belief, Godfread has heavily publicized his collaboration with Cooper and belief, and has leveraged this publicity to gain dozens of new clients for his own copyright infringement defense practice.

Cooper met Mr. Steele in 2006 through a mutual friend, Brent Berry.  Berry Aff. ¶¶ 4-5 (attached hereto as Exhibit C).  Steele was looking someone to watch his 120-acre vacation

---

rights.  Purporting to speak on behalf of "cyberspace," a co-founder of EFF (who presently serves on its board of directors) has warned the "Governments of the Industrial World" that "[y]our legal concepts of property, expression, identity, movement, and context do not apply to us." John Perry Barlow, A Declaration of the Independence of Cyberspace (Feb. 8, 1996), available at https://projects.eff.org/~barlow/Declaration-Final.html (as of April 17, 2013).

property in Northern Minnesota, which had a main cabin and a guest cabin. *Id.* Cooper, who was in the process of his first divorce, needed a place to live with his daughter. Steele Aff. ¶ 2 (attached hereto as Exhibit D). In exchange for a rent-free use of the guest cabin, Cooper agreed to look after the property and perform upkeep services. *Id.* Cooper's presence also served to deter wrongdoers from vandalizing or stealing Steele's property, which was a problem Steele had experienced in the past. *Id.* At the time he moved in, Cooper was employed at a company located approximately 15 miles away from Steele's property. *Id.*

Steele visited his vacation property regularly between 2005 and mid-2011 and became close friends with Cooper. *Id.* ¶¶ 2-4. Steele and Cooper spent substantial time together, including, for example, boating on Lake Mille Lacs, riding all-terrain vehicles, snowmobiling, and attending estate auctions. *Id.* Steele and Cooper would regularly collaborate on various handyman projects, including building a porch addition to and re-roofing the guest cabin. *Id.* Cooper and Steele regularly attended county fairs and other Northern Minnesota social events together, including the White Pine Logging and Thrashing show, Howie's Mud Bog, the Aitkin County July 4th fair, and the Kanabec County fair. *Id.* Cooper's relationship extended to Steele's family. *Id.* Conservatively speaking, Cooper joined Steele's family for dinner over 100 times. On several occasions he babysat Steele's daughter. *Id.* The two were such good friends that Cooper remarked on several occasions that Steele was the brother he never had. *Id.* ¶ 4.

Cooper began to experience financial hardship when he was laid off on or around late 2010. *Id.* ¶ 5. Although he was able to find seasonal construction work, Cooper frequently complained that he was not able to dig himself out of the debt he accrued during stretches of unemployment. *Id.* Cooper's financial hardship was a common topic of conversation during

Steele's visits.  *Id.*  Cooper regularly inquired if Steele had any ideas for Cooper in terms of job openings or business opportunities.  *Id.*  One of these inquiries arose during a visit in late 2010, when Steele was a partner in a newly-formed law firm organized to fight digital piracy. *Id.* ¶ 6.

Steele described the litigation and his business to Cooper.  *Id.* ¶ 7.  At some point in early 2011, Steele and Cooper discussed how a friend of Steele's was exploring opportunities relating to purchasing and marketing adult content.  *Id.* ¶ 8.  Cooper expressed interest in learning more about these opportunities and Steele offered to help him learn more.  *Id.* Eventually, Steele and Cooper agreed that Steele would help Cooper form a business entity that would allow Cooper to pursue these opportunities. *Id.*; Berry Aff. ¶¶ 10-11.  He spoke to Steele many times about this project.  Steele Aff. ¶ 8; Berry Aff. ¶ 10-12.  Cooper was overheard by his long time friend, Brent Berry, asking Steele, "How's my porn company doing?" Berry Aff. ¶¶ 10-11.  He further joked about never having to worry about having beer money again.  *Id.* ¶ 10.  Cooper's then-wife was against Cooper's participation in the adult industry.  Flesher Aff. ¶¶ 3-7 (attached hereto as Exhibit E).  They regularly fought about this issue, and these fights were overheard by multiple people, including Steele and a mutual friend, Jason Flesher. *Id.*

Cooper ended up not moving forward with the ideas Steele proposed to him, but he continued to express interest in connecting with people in the industry to learn more about the business.  Steele Aff. ¶¶ 9-11.  Steele offered to introduce Cooper to Mark Lutz, who operated two companies, AF Holdings, LLC and Ingenuity13, LLC.  *Id.*  Specifically, Steele informed Cooper that he could volunteer as a corporate representative for these companies in order to gain exposure to the industry and people who could help him.  *Id.*  In this way, Cooper could identify opportunities for himself, and possibly develop partnerships with

industry insiders.  *Id.*  Cooper participated in a limited number of transactions in the latter half of 2011, including acknowledging two assignment agreements on behalf of AF Holdings, LLC.  *Id.*

In early 2012, external pressures on Cooper were growing.  *Id.* ¶¶ 11-15.  His financial situation was worsening, he went through a second divorce, and he began exhibiting symptoms of alcohol abuse.  *Id.*; Berry Aff. ¶¶ 13-18.  Cooper's behavior and attitude underwent substantial change.  *Id.*  Whereas Cooper had once been a stable, friendly individual, Cooper now began acting erratically, often alternating between despondency and mania.  *Id.*  By way of example, in the summer of 2012, Steele offered the use of his cabin to Flesher and his family.  Flesher Aff. ¶ 8.  On a daily basis during the week Flesher was there, Cooper, usually inebriated and acting aggressively, entered the main cabin without permission and started turning off all of the lights while yelling at the guests.  *Id.* ¶¶ 9-11. Several of Steele's family members and friends stopped visiting Steele's cabin due to Cooper's bizarre behavior.  Steele Aff. ¶ 16.  Cooper's aggression regarding financial matters spiked markedly during this time.  Whenever Steele would visit his cabin, Cooper would have a new half-baked business investment proposal for Steele's consideration, including a landscaping business, a hauling business and a lumber business.  *Id.*  Cooper's requests to borrow money from Steele became increasingly frequent.  *Id.*  Although Steele had helped out Cooper in the past, Steele finally instructed Cooper to stop asking him for money.  *Id.*

In mid-2012, Steele listed his vacation property for sale by auction.  Berry Aff. ¶ 16. Steele had moved to Miami Beach, Florida and was not able to make regular use of his property.  Steele Aff. ¶ 17.  Cooper reacted very negatively to this news presumably because it meant he would no longer have a free place to stay.  *Id.*  In mid-August, 2012, Steele's real

1   estate agent, and Cooper's friend, Berry traveled to Steele's property to prepare it for a

2   showing.  Berry Aff. ¶ 19.  When he arrived at the property with his girlfriend to stage the

3   main cabin, Cooper came out of the guest cabin in an extremely agitated state.  Cooper ran

4   towards them and threatened to hurt Berry and his girlfriend.  *Id.*  Berry and his girlfriend

5   managed to get in his car and escape before Cooper reached them.  *Id.*

6       Immediately afterwards, Berry called Steele and informed him that he could not

7   legally or safely show the property under these conditions.  *Id.*  Berry also contacted the

8   Aitkin County, Minnesota, police to file a report on the incident.  *Id.*  Text messages sent by

9   Cooper suggest that Cooper's mental health had further deteriorated. In those messages,

10  Cooper stated that he is "messed up in the head," that "how [he] think[s] is not right," that it

11  "sucks being fucked up," and that it "sucks even more knowing [he] [is] fucked up."  Berry

12  Aff. Exhibit A.  The text messages indicated that Cooper was now seeing a doctor and had

13  been prescribed medication to address his mental health issues.

14      In September 2012, due to this worsening behavior, Steele asked Cooper to leave his

15  property.  Steele Aff. ¶ 18.  Cooper was extremely upset and embarked on an extensive

16  campaign of revenge.  *Id.* ¶¶ 18-20.  Cooper used a chainsaw to remove large portions of

17  load-bearing walls in Steele's guest cabin, tore down nearly every interior wall in the guest

18  cabin, stole 4 rifles, 1 shotgun and 5 pistols Steele stored on his property, threatened

19  prospective buyers of Steele's property, cut down significant acreage of wood and

20  unlawfully removed it from Steele's property, and stole hundreds of items, including tools,

21  equipment, lumber, and virtually every item that was not bolted down in Steele's kitchen.  *Id.*

22  Cooper even stole a large trailer of Steele's that Cooper used to haul away entire rooms of

23  furniture from Steele's cabin.  *Id.*

24  *///*

On September 4, 2012, Cooper called Steele and informed him that Steele had better pay him "a lot of money" or "he would be sorry for kicking him out." *Id.* ¶ 21.  Then, in November 2012, Steele was contacted by attorney Paul Godfread.  Godfread informed Steele that he was representing Cooper in an investigation regarding AF Holdings and accused Steele of holding out Cooper as AF Holdings' CEO.[4]  Over time, Cooper's accusations against Steele and Plaintiff have changed, culminating in his testimony at the March 11, 2013, hearing before Judge Wright in Los Angeles, California.

## II.   AF HOLDINGS LLC IS OWNED BY THE SALT MARSH TRUST

Mark Lutz directed the formation of AF Holdings in mid-2011 and is its current manager.  Lutz Aff. ¶ 5 (attached hereto as Exhibit F).  AF Holdings is a limited liability company formed in the Federation of Saint-Kitts and Nevis.  The membership interests of AF Holdings are held in a trust named, "Salt Marsh." *Id.* ¶¶ 1-2.  The class of potential beneficiaries of the Salt Marsh trust are, "any children born to or adopted by [Lutz], and any of [Lutz's] subsequent descendents." *Id.* ¶¶ 3-4.  Because Lutz does not have any children or descendents, the beneficiaries of the Salt Marsh Trust are presently undefined. *Id.* ¶ 6.

///

///

///

///

///

///

///

---

[4] It bears mentioning that the assignment in this case *does not* identify Cooper as being a corporate officer of AF Holdings, LLC.

### III.   THE COURT SHOULD NOT SANCTION PLAINTIFF AND/OR PLAINTIFF'S COUNSEL

Cooper's repudiation cannot serve as a foundation for sanctions in this copyright infringement case.  Plaintiff did not submit the assignment document to the Court for the purpose of asserting the validity of Cooper's corporate representative status.  It did so for the purpose of asserting its ownership of the copyright that Defendant Harris allegedly infringed. Cooper's signature is not germane to the case and controversy before this Court.  The Court could strike Cooper's signature from the assignment and the assignment would continue to satisfy the formal requirements of the Copyright Act.  *See* 17 U.S.C. § 204.  Further, notwithstanding Plaintiff's contention that Cooper's repudiation is irrelevant to the instant case, out of an abundance of caution Plaintiff immediately notified the Court of Cooper's testimony.  (*See* ECF 42.)

#### A.  The Court Should Not Sanction Plaintiff Pursuant to Its Inherent Power

Sanctions under the Court's inherent power are limited to circumstances where Plaintiff has engaged in bad faith conduct. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 47 (1991) ("the narrow exceptions to the American Rule effectively limit a court's inherent power to impose attorney's fees as a sanction to cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders . . . ."). Plaintiff has not engaged in bad faith in this matter.  It has a copyright that was infringed on by the Defendant.

Further, there is no basis for a finding that Plaintiff or Plaintiff's counsel attempted to deceive or defraud the Court, Defendant, or any of the third-party objectors, as there was no attempt to induce reliance by any of those entities with respect to Cooper's acknowledgement. *See City Solutions, Inc. v. Clear Channel*, 365 F. 3d 835, 839 (9th Cir. 2004) (explaining that "[t]he elements of fraud … are (a) misrepresentation (false

1  representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c)

2  intent to defraud, *i.e., to induce reliance*; (d) justifiable reliance; and (e) resulting damage.")

3  (emphasis added).

4         The relevant inquiry in this case is whether the assignment conferred standing on

5  Plaintiff to sue Defendant for copyright infringement.   Cooper's acknowledgement is not

6  relevant to this inquiry.   The only entity that could possibly be harmed by Cooper's

7  repudiation is Plaintiff.   The only person who could possibly be harmed by the alleged

8  misuse of his name—and there was no misuse of Cooper's name—is Cooper.   Neither

9  Defendant Harris nor any third-party objector has standing to litigate this dispute on behalf

10 of Cooper or Plaintiff.

11        **B.  The Court Should Not Sanction Plaintiff Pursuant to Fed. R. Civ. P. 11**

12        The Rules require that a plaintiff may bring a lawsuit only if it supported by valid

13 evidence and law. Fed. R. Civ. P. 11(b). Plaintiff claims are supported by valid evidence and

14 law. As explained above, the assignment is valid. *Effects Associates, Inc.*, 908 F.2d at 557;

15 17 U.S.C. § 204. As a result, the Court should not sanction Plaintiff and/or Plaintiff's

16 counsel pursuant to Fed. R. Civ. P. 11.

17 **IV.    THE COURT SHOULD ASSIGN LIMITED WEIGHT TO THE**

18        ***INGENUITY13, LLC* ORDER**

19        The Court's order to show cause references "disturbing" factual determinations made

20 in an order issued from the U.S. District Court for the Central District of California.  (Dkt. 51

21 at 2) (referencing, Order Issuing Sanctions, *Ingenuity13, LLC v. John Doe*, No. 12-cv-8333-

22 ODW-JC (C.D. Cal. May 5, 2013) ECF. No. 130.)  Plaintiff acknowledges that the factual

23 determinations in the sanctions order—if valid—would be cause for serious concern.

24 However, the findings of fact in the sanctions order were premised on improper inferences

1   from certain individuals' invocation of the privilege against compelled testimony.  At the

2   April 2, 2013, hearing, the district court stated, "I want to know if some of my conjecture is

3   accurate. The only way I can find out is to have the principles [sic] here and answer those

4   questions. Now, if you say he will not answer those questions, then I will draw whatever

5   inferences I think are reasonable from the facts as I know them." *See* Transcript, Apr. 2,

6   2013 Hearing on Order to Show Cause, at 8:24–9:4 (attached hereto as Exhibit G).  Yet, the

7   order to show cause that precipitated the April 2, 2013, hearing threatened, *inter alia*,

8   incarceration.  Further, the sanctions order itself imposed criminal penalties in the form of a

9   punitive doubling of the attorney's fee award pursuant to the district court's inherent power.

10  *See F.J. Hanshaw Enters., Inc. v. Emerald River Develop., Inc.*, 244 F.3d 1128, 1139 (9th

11  Cir. 2001) (applying strict due process protections to the imposition of punitive sanctions

12  under a court's inherent powers).

13          The Supreme Court has made clear that an inference of guilt may not be drawn from a

14  defendant's failure to testify about facts relevant to his case in the criminal setting. *Griffin v.*

15  *California*, 380 U.S. 609 (1965). "Too many, even those who should be better advised, view

16  this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it

17  are either guilty of crime or commit perjury in claiming the privilege." *Ullmann v. United*

18  *States*, 350 U.S. 422, 426 (1956). Rather, "[t]he privilege serves to protect the innocent who

19  otherwise might be ensnared by ambiguous circumstances." *Slochower v. Board of Higher*

20  *Education*, 350 U.S. 551, 557, 558 (1956); *accord Griffin*, 380 U.S. at 613.  The district

21  court's order imposing criminal sanctions without providing any due process has been

22  appealed to the U.S. Court of Appeals for the Ninth Circuit.

23                                    **CONCLUSION**

24          The Court should discharge its order to show cause and lift its stay of the proceedings.

Dated this 25th day of May, 2013

Law Offices of Steven James Goodhue

By: /s/ Steven James Goodhue
    Steven James Goodhue (#029288)
    9375 East Shea Blvd., Suite 100
    Scottsdale, AZ  85260
    *Attorney for Plaintiff*
    *AF Holdings, L.L.C.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2013, I electronically filed the foregoing with the Clerk of the Court for filing and uploading to the CM-ECF system which will send notifications of such filing to all parties of record.

**A COPY** of the foregoing was mailed (or served via electronic notification if indicated by an "*") on May 25, 2013, to:

Honorable G. Murray Snow *(*snow_chambers@azd.uscourts.gov*)
U.S. District Court
Sandra Day O'Connor Courthouse Suite 324
401 West Washington Street, SPC 82
Phoenix, Arizona 85003-7550

David Harris* (troll.assassins@cyber-wizards.com)
4632 East Caballero Street, #1
Mesa Arizona  85205


/s/ Steven James Goodhue