Steven James Goodhue (#029288)
Law Offices of Steven James Goodhue
9375 East Shea Blvd., Suite 100
Scottsdale, AZ  85260
Telephone: (480) 214-9500
Facsimile: (480) 214-9501
E-Mail: sjg@sjgoodlaw.com

*Attorney for Plaintiff*
*AF Holdings, L.L.C.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AF HOLDINGS, L.L.C., a St. Kitts and Nevis limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>DAVID HARRIS,<br><br>Defendant. | **CASE NO.: 2:12-CV-02144-PHX-GMS**<br><br><br>**PLAINTIFF AF HOLDINGS' BENCH MEMORANDUM IN RESPONSE TO THE COURT'S JUNE 11, 2013, ORDER** |

## INTRODUCTION

On June 11, 2013, the Court ordered Plaintiff to respond to additional questions at an order to show cause hearing scheduled for July 19, 2013. (ECF No. 71.) Plaintiff hereby submits this bench memorandum to aid the Court's consideration of these questions.

As a threshold matter, Plaintiff briefs the Court on the definition of "swarm"—a technical term that appears frequently in the Court's June 11, 2013, Order. The term "swarm" has been defined with great variance by district courts nationwide. Plaintiff submits that the proper way to approach defining a swarm is to start with the universe of BitTorrent users and determine from there what factors define a swarm.

The universe of BitTorrent users consists of hundreds of millions of individuals across the world that, over time, have stolen files consisting of virtually every modern-era song, book, software or video ever produced for commercial distribution.

One way to define a swarm is by the content that is being distributed. Thus, for example, the group of individuals that used BitTorrent to steal copies of the movie, "The Godfather," would be considered to be in a different swarm than the group of individuals that stolen copies of its critically-acclaimed sequel, "The Godfather Part II."

A second way to distinguish a swarm is by hash value. A hash value is simply a string of characters that corresponds to an exact version of media content, just as a social security number corresponds to an exact individual. By way of example, a copy of the movie, "The Godfather" that is optimized for viewing on an iPad would have a different hash value than a copy of the movie that is optimized for DVD. A hash value also has technical significance in that BitTorrent distribution among users can only occur with respect to files with identical hash values. In other words, a user attempting to steal a copy of the iPad-optimized version of "The Godfather" cannot, as a technical matter, exchange pieces of the file with a user who is attempting to steal the DVD version of the same movie. To invoke a metaphor, one can imagine a commodities exchange. Traders in the corn pit, for example, do not interact with traders in the pork bellies pit. Although everyone in the exchange may be trading commodities, only participants in the same pit trade with one another. In the BitTorrent context, the commodities exchange itself is the file that is being distributed (e.g., "The Godfather), each trading pit would be a version of the file that corresponds to a particular hash value (e.g. an iPad optimized version) and the group of traders in the pit would be the swarm.

A third way to distinguish a swarm is by time. Returning to the commodities exchange metaphor, one might define a swarm as the group of traders that is in the pit at any instant in time. Under this method, the swarm would be redefined every time a person entered or exited the trading pit. Alternatively, one might select an arbitrary time window—a week, for example—and define the swarm as the traders that were in the pit during the week. Finally, one might decline to use time as a distinguishing factor. Courts nationwide have taken different approaches in this respect.

In Plaintiff's view, a swarm is a group of users who trade a file with a given hash tag. Plaintiff does not support the use of an arbitrary time window to distinguish a swarm. There are several reasons why an arbitrary time window is problematic. First, the contribution of a user to a swarm on a given day contributes to the health of the swarm on a later date, even if the user has left it. Second, for a variety of technical reasons, defining a swarm by a given date and time creates unsolvable forensic monitoring problems. Finally, the concerns that are raised by the absence of an arbitrary time window—the joinder of hundreds of thousands of users in a single suit, to use an extreme example—are better addressed by the many tools available to district courts to ensure that the cases before them are manageable.

## **DISCUSSION**

**(1) TO THE EXTENT THAT PLAINTIFF PREVIOUSLY SOUGHT AND RECEIVED DUPLICATIVE DISCOVERY, WHY SHOULD THE COURT RE-AUTHORIZE IT HERE?**

Several of the Court's questions appear to contemplate that Plaintiff has substantially recreated before this Court an action that was originally brought in the District of Columbia. This is not the case. In the D.C. Action, Plaintiff was granted leave to discover the identifying information of individuals associated with 1,140 IP addresses. Among those IP addresses was an IP address associated with the Defendant in this action.

3

After it ascertained, *inter alia*, Mr. Harris' identity, Plaintiff dismissed the case without prejudice. Because Mr. Harris elected not to settle Plaintiff's claims, and because he resides in Arizona, Plaintiff elected to bring its case against him in this District in order to avoid any challenges to personal jurisdiction and/or venue.

The discovery Plaintiff seeks in this case is not duplicative of the discovery it sought in the D.C. action. In other words, Plaintiff is not re-seeking the identities of the individuals it already identified in the D.C. action. Instead, Plaintiff is seeking the discovery of *other* individuals from the same swarm, who entered the swarm after the Mr. Harris; but who were not involved in the D.C. Action. There is no known overlap between these individuals and the individuals whose identities Plaintiff sought in the D.C. action.

How is this possible? The answer is that the overall swarm was much larger than the number of individuals Plaintiff sought to identify in the D.C. action. Plaintiff did not seek discovery of the entire swarm in the D.C. action due to several factors. First, Plaintiff has a duty to avoid imposing an undue burden on third-parties. Plaintiff refrained from seeking discovery with respect to certain infringers where those infringers were subscribers to Internet Service Providers ("ISP's") from which Plaintiff was already seeking meaningful quantities of subscriber identifying information. Second, the swarm continued to expand even after Plaintiff's lawsuit. While Plaintiff's lawsuit dealt a blow to the swarm, it did not end its existence.

**(2) TO THE EXTENT THAT PLAINTIFF HAS NOW REASSERTED THE SAME CLAIMS RESULTING FROM THE SAME SWARM IN A DIFFERENT COURT, WOULD THOSE PREVIOUS SETTLEMENTS HAVE CAUSED PLAINTIFF TO FORFEIT, OR OTHERWISE AFFECT PLAINTIFF'S CLAIMS IN THIS CASE?**

Plaintiff is not reasserting the same claims resulting from the same swarm in a different court. As discussed in its response to the Court's first question, Plaintiff is

4

currently seeking discovery with respect to a different set of infringers and infringements than it did in the D.C. Action. The Court's question notes the key provision of the Copyright Act, namely 17 U.S.C. § 504(c). This section states that a Plaintiff is allowed a single recovery for "all infringements involved in the *action*, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally." *Id.* (emphasis added). Section 504 does not state that a copyright owner is limited to a single statutory damage award for each work, no matter how many actions the owner brings. Accordingly, a settlement (or even a judgment, for that matter) achieved in a different action would not cause Plaintiff to forfeit its claims in this case. This reasoning is consistent with *Louis Vuitton Malletier SA v. Akanoc Solutions*, 658 F.3d 936 (9th Cir. 2011), in which the Ninth Circuit stated that a plaintiff may receive a single statutory award for all infringements of any one copyrighted work from either (1) any one *defendant*, where that defendant is separately liable or (2) multiple *defendants*, where those *defendants* are jointly and severally liable. *Id.* at 946 (emphasis added).

**(3)** **WHY WOULD IT NOT BE AN ABUSE OF CONGRESS'S PURPOSES AND ON THE FEDERAL COURT SYSTEM TO ALLOW PLAINTIFF TO FILE SUITS AGAINST THE SAME DEFENDANTS IN MULTIPLE DISTRICTS FOR PARTICIPATION IN THE SAME BITTORRENT SWARM, CONDUCT SETTLEMENT OF SUCH CLAIMS IN SOME DISTRICTS, AND THEN CONTINUE TO PROSECUTE SUCH CLAIMS IN OTHER DISTRICTS WITHOUT ACKNOWLEDGING THAT THEY HAVE INDEPENDENTLY SETTLED SOME OF THE CLAIMS AGAINST SOME OF DEFENDANT'S ALLEGED CO-CONSPIRATORS?**

Plaintiff identified Defendant by virtue of the discovery that it was permitted to seek in the D.C. Action. When Plaintiff learned that Defendant was a citizen of Arizona, it elected to pursue its claims against Defendant in a forum where personal jurisdiction and venue issues would not arise. To the extent that the Court is suggesting that Plaintiff's

5

refiling of its lawsuit in this District is an abuse of Congress' intent or of the federal court system, then Plaintiff would note that doing so resolves personal jurisdiction and venue issues that remain controversial in BitTorrent-based infringement litigation.  To the extent that the Court's question rests on the assumption that Plaintiff is filing consecutive lawsuits against the same group of individuals in multiple districts, then Plaintiff, as discussed, *supra*, would submit that it is not doing so—except to the extent that it refiled its suit against Defendant Harris after determining his location.

### (4) QUESTIONS RELATED TO PRIOR SETTLEMENTS, SEPARATE LAWSUITS AND DISCOVERY

The Court premises its fourth question on the assumption that a copyright holder plaintiff may not make separate elections as to multiple defendants involved in the same BitTorrent swarm if it wishes to pursue a theory of joint and several liability.  Plaintiff respectfully disagrees, and incorporates by reference the reasoning adopted by the Honorable Judge Kimba Wood in the decision in *Arista Records LLC v. Lime Group LLC*, No. 1:06-cv-05936-KMW-DCF (S.D.N.Y. Mar. 10, 2011).  In sum, Judge Wood reasoned that the Copyright Act takes an *action* based approach versus a "universe of infringements" approach.  *See id.*  In a footnote, Judge Wood endorsed the plaintiff's view that an interpretation of the Copyright Act to allow a single award of statutory damages per work, even across actions, would lead to an untenable interpretation of the Copyright Act.  *See id.*

#### a. Why Shouldn't the Court Take Into Account the Amount of Settlements Already Achieved by Plaintiff With Respect to the Other Participants in the Same BitTorrent Swarm?

Plaintiff submits that the Court should take into account the amount of settlements already achieved by Plaintiff with respect to the other participants in the same *action* versus the same BitTorrent swarm.  The Copyright Act takes an *action*-based approach to liability.

It does not state or otherwise imply that judgments (or settlements) in other actions preclude judgments (or settlements) in an instant action. In *Arista,* the Court reasoned:

> Section 504 speaks about limiting statutory awards based on infringements involved in "this action"; it does not speak to precluding statutory awards across different actions. The statute does not state that an award of statutory damages against a defendant in one action has an effect on a statutory award against a different defendant in a different action. *Id* at Pg 5.

### b. Further, why Should the Court not Require Plaintiff to File Separate Lawsuits as Against Each Separate Defendant Against Which it Asserts a Claim?

In this matter, Plaintiff has asserted a claim against a single Defendant. Plaintiff is prepared to brief the propriety of joinder should it attempt to join additional defendants to the instant action. For now, though, Plaintiff is attempting to hold Defendant joint and severally liable for a broad range of infringements to which Plaintiff alleges Defendant contributed, which means Plaintiff is making the tradeoff between several smaller judgments and a single large (but potentially uncollectable) judgment.

### c. In Such a Case, on What Basis Should the Court Grant Plaintiff's Request for Discovery?

As stated in Plaintiff's Motion Authorizing Issuance of Subpoenas:

"Plaintiff needs the identifying information of the Defendant's co-conspirators to prosecute its case against the Defendant. In its Complaint, Plaintiff sought "an order that Defendant is jointly and severally liable to the Plaintiff in the full amount of Judgment" for both its contributory infringement and civil conspiracy claims. (ECF No. 1 at 13.) Therefore, Plaintiff needs this information to be able to establish the Defendant's liability and ascertain the extent of the damages caused by the infringement to which Defendant contributed and the conspiracy in which Defendant participated. Further, the infringement of Plaintiff's copyrighted work is ongoing and continuous, necessitating immediate relief to prevent further irreparable harm to Plaintiff. Without a way to contact the Defendant's co-conspirators, Plaintiff will continue to suffer ongoing, continuous injury due to the illegal activities." (ECF No. 39)

See also answer to Question 6 below.

**(5) INFORMATION REQUESTS REGARDING THE D.D.C. CASE**

Plaintiff will address the Court's information request at the Order to Show Cause hearing.

**(6) QUESTIONS RELATED TO DISCOVERY IN THIS LAWSUIT**

As an initial matter, Plaintiff would clarify its position on the discovery issue the Court has raised. After the Rule 26(f) scheduling report issued, Plaintiff issued subpoenas to a several ISPs seeking the identifying information of Defendant's joint tortfeasors. After issuing these subpoenas, Plaintiff filed a motion for an authorizing order with the Court. Plaintiff admittedly created confusion by incorrectly labeling its motion as a motion for authorization for leave to issue subpoenas, which is normally what Plaintiff files when it seeks to issue subpoenas prior to the Rule 26(f) conference, as it did in the D.C. action. Here, Plaintiff sought the Court's authority for the ISPs subject to the subpoena to furnish subscriber information. ISPs do not uniformly agree on whether the Cable Act requires a Court order prior to releasing subscriber information, but most ISPs insist on one. Here, Plaintiff issued subpoenas, but the majority of the ISPs to which it issued subpoenas were awaiting the Court's decision on the authorizing order.

### a. How Many Users on That List of IP Addresses has Plaintiff Previously Sued as a Doe Defendant or Otherwise?

Plaintiff is not aware of any users on the list of IP addresses that it has previously sued as a Doe Defendant or otherwise. Plaintiff actively attempts to avoid suing Doe Defendants in multiple actions so as to avoid the issues raised in the Court's order to show cause.

> **b. With How Many of Those Users, if Any, has Plaintiff Engaged in Settlement Discussions in Relation to This Lawsuit, and What are the Nature and Amount of Those Settlements?**

Plaintiff will address this question at the Order to Show Cause Hearing.

**(7) OBJECTIONS TO THE COURT'S PROPOSED NOTICE TO SUBSCRIBERS**

Plaintiff would support the use of a notice. Plaintiff specific concerns are as follows:

- The language regarding joinder in the "Other Issues" section should reflect the fact that Plaintiff has not joined other individuals to its lawsuit at this juncture, but reserves the right to do so in the future;

- The language regarding statutory damages should reflect that damages for willful infringement can reach as high as $150,000, plus legal fees. In peer-to-peer infringement cases, willful infringement is typically readily established.

**(8) ALAN COOPER INFORMATION**

The two assignment agreements at issue in this matter are the assignment agreement with respect to a work, "Sexual Obsession" and a work, "Popular Demand." Plaintiff will address the remainder of the Court's questions at the Order to Show Cause Hearing.

**(9) ALAN COOPER'S FINANCIAL INTEREST IN AF HOLDINGS, LLC AND ALAN COOPER'S AUTHORITY AS A CORPORATE REPRESENTATIVE OF AF HOLDINGS, LLC**

Cooper has never possessed a financial interest in Plaintiff. As discussed in its response (ECF No. 56) to the Court's May 17, 2013, Order to Show Cause (ECF No. 51), Plaintiff's membership units have been held in trust since its formation. (*See* ECF No. 56 at 9.) Cooper has never been a beneficiary of that trust and was never made any promises that he would someday be one.

9

Cooper's authority with respect to Plaintiff was limited to acknowledging the receipt of documents on Plaintiff's behalf on a case-by-case basis.  Although Cooper has previously claimed, for example, that Plaintiff held him out as its Chief Executive Officer, this claim has never been—and cannot be—substantiated with evidence.  Plaintiff's motivation for having Cooper acknowledge its assignments was the privacy benefit for Plaintiff's manager, Mark Lutz.  Cooper's apparent motivation for his involvement with Plaintiff was his desire to gain a foothold in the adult industry.  Plaintiff understands that Cooper's prior entrepreneurial efforts in this area had mothballed and that Mr. Steele was attempting to help Cooper find a different path to greater financial security.  Plaintiff found Mr. Cooper to be unreliable and declined to work any further with him.

**(10) THE REPRESENATIVES AT AF HOLDINGS FROM WHOM PLAINTIFF'S COUNSEL IS RECEIVING DIRECTION AS TO THIS LITIGATION AND THE NATURE OF THEIR INVOLVEMENT**

Plaintiff's counsel has received direction from counsel for AF Holdings, LLC, Brett Gibbs and Plaintiff's manager, Mark Lutz.  Until Mr. Gibbs' departure as AF Holdings, LLC's lead counsel, Mr. Gibbs was the supervising attorney and point of contact for all of the work performed on behalf of the Plaintiff in this case and cases throughout this district.  I currently receive direction in this matter directly from Mr. Lutz.  The undersigned counsel has also received direction from Paul Duffy of Prenda Law, Inc.

**(11) SUPPLEMENTAL PLEADING REGARDING MEDICAL ISSUES**

Plaintiff's counsel has complied with this requirement.

Respectfully submitted


By: /s/ Steven James Goodhue
    Steven James Goodhue (#029288)
    9375 East Shea Blvd., Suite 100
    Scottsdale, AZ  85260
    *Attorney for Plaintiff*
    *AF Holdings, L.L.C.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2013, I electronically filed the foregoing with the Clerk of the Court for filing and uploading to the CM-ECF system which will send notifications of such filing to all parties of record.

**A COPY** of the foregoing was mailed (or served via electronic notification if indicated by an "*") on May 25, 2013, to:

Honorable G. Murray Snow *(*snow_chambers@azd.uscourts.gov*)
U.S. District Court
Sandra Day O'Connor Courthouse Suite 324
401 West Washington Street, SPC 82
Phoenix, Arizona 85003-7550

David Harris* (troll.assassins@cyber-wizards.com)
4632 East Caballero Street, #1
Mesa Arizona  85205


/s/ Steven James Goodhue